**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

RECEIPT #
AMOUNT $ 250.00
SUMMONS ISS.
LOCAL RULE 4.1
WAIVER OF SERV.
MCF ISSUED
BY DPTY CLK
DATE

ROBERT FAUSSNER, Individually and On Behalf of All Others Similarly Situated,

    Plaintiff,

vs.

INVESTORS FINANCIAL SERVICES CORP.,
KEVIN J. SHEEHAN, MICHAEL F. ROGERS,
JOHN N. SPINNEY JR., ROBERT D. MANCUSO,
EDMUND J. MARONEY,

    Defendants.

)
)
)
) **CIVIL ACTION NO. 121**
)
)
)
)
) **CLASS ACTION COMPLAINT**
)
) 05 - 1 1 C 8 7 RCL
)
)
) **JURY TRIAL DEMANDED**
) Referred to MJ J6 Dein
)

Plaintiff, Robert Faussner, ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Investors Financial Services Corp. ("Investors Financial" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the securities of Investors Financial (the "Class") between October 15, 2003 and July 14, 2005 seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act".)

2. Investors Financial operates as a bank holding company for Investors Bank & Trust

Company that provides asset administration services for the financial services industry in the United States.

3.      The complaint alleges that defendants' Class Period representations regarding Investors Financial were materially false and misleading when made for the following reasons: (1) that the Company's improper accounting practices resulted in a $6.2 million reduction in net interest income; (2) that the Company lacked adequate internal controls; (3) that the Company's financial results were in violation of Generally Accepted Accounting Principles ("GAAP"); (4) that due to the impact of interest rate yield compression and the flattening of the interest rate curve the Company's 2005 guidance was not achievable; (5) that defendants' use of interest rate swaps to hedge against the negative impact to the balance sheet was ineffective; and (6) that as a consequence of the foregoing, defendants' statements with respect to the Company's growth and progress lacked in all reasonable basis when made.

4.      The Company announced that its 2005 and 2006 previously announced earnings guidance was not achievable. On this news, shares of Investors Financial fell $7.47 per share, or 17.99 percent, on July 15, 2005, to close at $34.05 per share

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

7.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

8.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, Robert Faussner, as set forth in the accompanying certification, incorporated by reference herein, purchased Investors Financial securities at artificially inflated prices during the Class Period.

7.     Defendant Investors Financial is a Delaware corporation with its principal executive offices located at 200 Clarendon Street, P.O. Box 9130, Boston, MA, 02117.

8.     Defendant Kevin J. Sheehan ("Sheehan") was, at all relevant times, the Company's Chairman and Chief Executive Officer.

9.     Defendant Michael F. Rogers ("Rogers") was, at all relevant times, the Company's President.

10.    Defendant John N. Spinney Jr. ("Spinney") was, at all relevant times, the Company's Senior Vice President and Chief Financial Officer.

11.    Defendant Robert D. Mancuso ("Mancuso") was, at all relevant times, the Company's Senior Vice President of Marketing and Client Management.

12.    Defendant Edmund J. Maroney ("Maroney") was, at all relevant times, the Company's Senior Vice President of Technology.

13.    Defendants Sheehan, Rogers, Spinney, Mancuso and Maroney are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Investors Financial's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## BACKGROUND

14.    Investors Financial operates as a bank holding company for Investors Bank & Trust Company that provides asset administration services for the financial services industry in the United States. The Company offers core and value-added services to financial asset managers, such as mutual fund complexes, investment advisors, family offices, banks and insurance companies. Its core services include middle office outsourcing, global custody, multicurrency accounting, and fund administration. The value-added services consist of securities lending, foreign exchange, cash

00005920.WPD ; 1                                    -4-

management, performance measurement, institutional transfer agency, investment advisory services,

lines of credit and brokerage, and transition management services.

## **SUBSTANTIVE ALLEGATIONS**

15.     On October 15, 2003, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Announces Third Quarter Earnings up 54%." Therein, the Company, in

relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported third
> quarter diluted earnings per share of $0.40, an increase of 54% from
> $0.26 in the third quarter of 2002. Net income for the third quarter
> was $26.4 million, up 53% from $17.3 million in the third quarter of
> 2002. For the nine months ended September 30, 2003, the Company
> reported diluted operating earnings per share of $1.01, an increase of
> 33% from $0.76 for the same period in 2002. Net operating income
> for the nine months ended September 30, 2003 was $67.0 million, an
> increase of 32% from $50.6 million for the same period of 2002.
> Prior year diluted earnings per share reflect the two-for-one stock
> split which occurred on June 14, 2002.

***

> Kevin J. Sheehan, Chairman and Chief Executive Officer,
> commented, "Investors Financial Services delivered extremely
> impressive results for the third quarter of 2003. Driven by new
> business wins, higher equity values, and prudent expense
> management, the Company continues to display strong earnings
> growth. In addition, we expect to complete most of the conversion of
> the $22 billion of Barclays Global Investors Canada Limited assets to
> our systems by the end of 2003."

16.     That same day, October 15, 2003, Investors Financial's management held an investor

conference call to discuss its third quarter earnings. During the call, defendant Spinney made the

following statements:

> We generate asset servicing fees based on assets under

administration, the number of transactions generated by our clients, and managed risk (ph) income. These three revenue components create a natural hedge for our business model, which has been one of the factors enabling us to succeed in a variety of market environments.

**The breakdown of our revenue stream for the third quarter of 2003 was 55 percent asset based, 15 percent transaction based, and 30 percent net interest income based, continuing the shift that we have witnessed recently to more of a contribution from asset-based fees as opposed to net interest income.**

\*\*\*

**Securities lending decreased 12 percent year-over-year, due to a smaller lending book, and declined linked quarter primarily due to the end of the international dividend season. Net interest income was flat on a year-over-year basis and decreased 8 percent linked quarter, primarily due to increased prepayments in our mortgage-backed securities portfolio through most of the summer. We expect lower prepayment activity in the fourth quarter.**

**Also we recorded an additional interest expense in the third quarter of approximately 1 million related to the ineffectiveness of our swap portfolio in accordance with FAS 133. The 1 million will flow back into net interest income over the remaining life of the swaps. Absent a further cut in the Fed funds rate, we expect little to no impact going forward.**

**We continue to maintain strong net interest margin spread as a result of continued healthy levels of client funding. The linked-quarter net interest margin decreased by 27 basis points to 1.81 percent, while the linked-quarter interest rate spread contracted by 26 basis points to 1.71 percent. Compared to the same quarter of last year, net interest income was flat, primarily as a result of a larger balance sheet offsetting a lower interest rate environment.**

\*\*\*

We continue to be cautiously optimistic about the capital markets and interest rate environment. As such we are increasing our GAAP EPS

guidance to a range of $1.30 to $1.32 a share for the year ended
December 31, 2003; and we're revising our diluted operating
earnings-per-share target to a range of $1.41 to $1.43. **We remain
comfortable with our long-term growth rate of 25 percent in EPS.
I would now like to open up the call to your questions.**
(Emphasis Added.)

17.     Additionally, during the call defendant Spinney had the following discussions with

several industry analysts:

JON ARFSTROM, ANALYST, RBC CAPITAL MARKETS: And
then in terms of your guidance, any change in the typical assumptions
that you give for a flattish market?

JOHN SPINNEY: In terms of rate environment?

JON ARFSTROM: Rate environment and equity market levels.

JOHN SPINNEY: We have no equity market upside built into our
estimates. We never do that. In terms of interest rate environment, in
terms of the rest of the year, obviously we don't think debt funds is
going anywhere from where it is today. And the ten-year will
probably trade somewhere, we hope, within the 4 percent range.

JON ARFSTROM: Okay. **And you're still comfortable with the 25
percent growth rate on that $1.40 to $1.43?**

JOHN SPINNEY: **Currently we are. Yes, Jon.**

\*\*\*

CASEY AMBRICH, ANALYST, MILLENNIUM PARTNERS: One
concern that some investors have had is regarding the potential NBS
mark that the company might incur with the ten-year moving up here;
the yields anyway. **I was wondering if you could talk a little bit
about your swaps on the liability side of the balance sheet? And
how that works to hedge that?**

JOHN SPINNEY: Certainly from the ten-year perspective on the
asset side of the balance sheet, the mark on that is positive still. It has
never run into a negative mark to market. And we're very comfortable
with that, and it doesn't have an impact on our regulatory capital if it

did.

Secondly on the swap portfolio, we use swaps basically against some of our deposit liability products to extend the maturities and fix those against fixed-rate assets. That really helps us to keep the duration up on the liabilities and matched with the asset duration.

\*\*\*

MERYL WITMER, ANALYST, EAGLE CAPITAL PARTNERS: **This is actually Meryl Witmer. Excuse me for being a little dense, but I am just looking at the comp and benefit line, which I believe went from almost 51 million in the second quarter to 42.5 million this quarter.** Is that like a lower bonus accrual? If you didn't let anybody go, is that a lower bonus accrual? Did people leave? Did you have some consultants you are now paying? What caused that?

JOHN SPINNEY: Some of that is bonus accrual; and some of that is taking the efficiencies in terms of headcount reductions in the business.

MERYL WITMER: So there were headcount reductions?

JOHN SPINNEY: As a result of not replacing positions for people that left the firm, where we had efficiencies in the technology that allowed us not to replace positions.

MERYL WITMER: I see; so you let some people run off and the technology took its place.

JOHN SPINNEY: Exactly. It just goes hand-in-hand with depreciation expense being up because we put the technology in place.

MERYL WITMER: I see. That ties in nicely. Now the lower bonus accruals, is that a foreshadowing of things not great to come?

JOHN SPINNEY: I think part of that, and we talked about it on the second-quarter call, was just a tremendous second quarter for us. **Having the ability to accrue bonuses against hiring earnings in the second quarter; that allowed us to take lower bonus accruals going forward.** And I think giving the REIT charge we took, we're not going to reach the potential of maximizing bonuses. So our

accruals are going to be lower just as a result of that.

MERYL WITMER: **So did you front-end load the bonuses into the second quarter?**

JOHN SPINNEY: **We accrue bonuses when we have the room (ph) in the EPS that marries up to it. So if the performance is there, we will accrue bonuses up against the performance.**

MERYL WITMER: **Although this quarter is very good also.**

JOHN SPINNEY: It is. But as we went into the third quarter, we looked at last year and said, last year's third quarter was not the best quarter in terms of transactional revenue; and the markets really took a sharp downturn; **so we were not about to get behind the eight-ball on bonus accruals, and have to make up for it in the summertime.**

***

CASEY AMBRICH: One last quick question. Can you give some color on how the margin changed by month? I will start with that.

JOHN SPINNEY: **The net interest margin? By month I don't think it's really that important to go through in detail. But if you look at the decline sequentially, the biggest contributor to that was obviously the prepayments on the mortgage-backed portfolio, that caused earnings to go down on the net interest income line.**

I actually added back the effect of that prepayment; and it probably gets us back to somewhere like 195, 196 from a margin perspective. So I clearly isolated the prepayments on the mortgage-backed portfolio. But we have those slow down now, and we are anticipating to have a fourth quarter of very slow prepayments relative to the third quarter.
(Emphasis Added.)

18.    On January 22, 2004, Investors Financial issue a press release entitled "Investors

Financial Services Corp. Announces Fourth Quarter Earnings Up 71% and Over $1 Trillion In

Assets Processed." Therein, the Company, in relevant part, stated:

Investors Financial Services Corp. (Nasdaq: IFIN) reported fourth quarter diluted earnings per share of $0.48, an increase of 71% from $0.28 in the fourth quarter of 2002. Net income for the fourth quarter was $31.9 million, up 74% from $18.3 million in the fourth quarter of 2002. For the year ended December 31, 2003, the Company reported diluted operating earnings per share of $1.49, an increase of 43% from $1.04 per share in 2002. Net operating income for the year was $99.0 million, up 44% from $68.9 million in 2002. Prior year diluted earnings per share reflect the two-for-one stock split which occurred on June 14, 2002.

Diluted operating earnings per share and net operating income for the year ended December 31, 2003 exclude a $7.2 million charge, net of federal income tax benefit, that resulted from a retroactive change in Massachusetts tax law enacted in the first quarter of 2003 and the Company's subsequent settlement of the resulting tax assessment with the Massachusetts Department of Revenue. The change in tax law disallowed a dividends received deduction taken by Investors Bank & Trust Company on dividends it had received since 1999 from a wholly-owned real estate investment trust. In the second quarter of 2003, the Company settled this disputed tax issue, agreeing to pay 50% of the liability, resulting in the $7.2 million charge, net of federal income tax benefit.

This press release includes both an income statement based on GAAP and a reconciliation of the GAAP income statement to a pro forma operating income statement that excludes the $7.2 million charge described above. Management believes that operating earnings per share and net operating income, which exclude the charge, present a more useful depiction of the Company's actual results of operations because they exclude the effect of a one-time change in tax law that is unrelated to the Company's ongoing operations. Including the $7.2 million charge, the Company recorded GAAP net income for the year ended December 31, 2003 of $91.8 million and GAAP diluted earnings per share of $1.38.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "2003 represented another outstanding year for Investors Financial Services. We delivered impressive growth in both revenue and net income, driven by new business wins, stronger capital markets and prudent expense management. In addition, our assets under administration exceeded $1 trillion for the first time. The current improving market conditions and the leverage inherent in our

> business model make us confident in our ability to deliver growth in
> earnings per share of 25% in 2004."

19.     On April 22, 2004, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Announces First Quarter Operating Earnings up 79 percent." Therein, the

Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported first
> quarter diluted earnings per share of $0.52, an increase of 79% from
> diluted operating earnings per share of $0.29 in the first quarter of
> 2003. Net income for the first quarter of 2004 was $35.0 million, up
> 81% from $19.3 million in net operating income in the first
> quarter of 2003.
>
> Both diluted operating earnings per share and net operating income
> for the first quarter of 2003 exclude the previously disclosed $13.9
> million, or $0.21 per diluted share, one-time tax accrual that the
> Company recorded in accordance with Accounting Principles
> Generally Accepted in the United States of America ("GAAP"). The
> one-time accrual resulted from a retroactive tax law change during the
> first quarter of 2003 by the Commonwealth of Massachusetts
> disallowing a dividends received deduction taken by Investors Bank
> & Trust Company on dividends received since 1999 from a
> wholly-owned real estate investment trust. In the second quarter of
> 2003, the Company settled this disputed tax matter pursuant to an
> agreement to pay 50% of the liability.
>
> This press release includes both an income statement based on GAAP
> and a pro forma income statement excluding the one-time tax accrual,
> which management considers a more useful depiction of the
> Company's results of operations. Including the tax accrual, GAAP net
> income for the first quarter of 2003 was $5.4 million and GAAP
> diluted earnings per share were $0.08.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer,
> commented, "Investors Financial Services again recorded impressive
> results in the first quarter of 2004. Led by strong increases in our core
> asset processing revenue, foreign exchange fees, and net interest
> income, we were able to grow our revenue by over 30% on a
> year-over-year basis. Due to our increased revenue and continued
> operating leverage, we are confident in our ability in 2004 to deliver

> growth in earnings per share in excess of 25% over our 2003
> operating earnings per share."

20. On July 14, 2004, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Announces Second Quarter Earnings up 63%." Therein, the Company, in

relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported second
> quarter diluted earnings per share of $0.52, an increase of 63% from
> $0.32 in diluted operating earnings per share in the second quarter of
> 2003. Net income for the second quarter was $35.4 million, up 66%
> from $21.3 million in net operating income in the second quarter of
> 2003. For the six months ended June 30, 2004, the Company reported
> diluted earnings per share of $1.04, an increase of 70% from $0.61 in
> diluted operating earnings per share for the same period in 2003. Net
> income for the six months ended June 30, 2004 was $70.4 million, an
> increase of 73% from $40.6 million in net operating income for the
> same period of 2003.
>
> \*\*\*
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer,
> commented, "The second quarter of 2004 represented another period
> of solid performance by Investors Financial Services. Our core and
> ancillary service fees continued to display impressive organic growth
> rates. New clients, further penetration of existing clients, and strong
> fund flows into our clients' products all contributed to these robust
> top-line increases. Given these results, we are confident in our ability
> to grow our diluted earnings per share in excess of 30% in 2004."

21. That same day, July 14, 2004, Investors Financial's management held an investor

conference call to discuss its second quarter earnings. During the call defendant Spinney had the

following discussions with several industry analysts:

> CARLA COOPER, ANALYST, ROBERT W. BAIRD: I had a
> question, I guess also about your guidance. Just if I think about your
> new guidance, even the top end of the range implies that the quarters
> coming up in the back half of the year are going to be a little weaker
> than certainly what we saw this quarter. And I'm just wondering sort

of philosophically, what sort of lens -- is there anything sort of conservatism baked in there, or what kind of -- I don't think you've ever had a year where the quarters have sort of been flat.

JOHN SPINNEY: **I think on the guidance front, Carla, we brought it up to a point where we felt comfortable achieving those numbers. And giving ourselves some flexibility, as we've historically always done, we start with a 25 percent growth rate at the beginning of the year and try to outperform it quarter after quarter and try to guide you up, and try not to get ahead of ourselves.**

\*\*\*

JAMIE LESTER, ANALYST, SAB CAPITAL MANAGEMENT: Great quarter. First question was on the occupancy expense. What caused the drop quarter-over-quarter in that?

JOHN SPINNEY: Pretty simple; we had favorable valuations on the buildings in Boston and got real estate tax relief, and a final true-up of our operating escalations from the landlords (multiple speakers)

JAMIE LESTER: That's the go-forward run rate on that?

JOHN SPINNEY: It's probably a little higher than that, because there was some pickup related to the whole year. So it's a little bit higher than what it is today.

JAMIE LESTER: Fair enough. And then on the leverage side, the equity was down quarter-over-quarter, I assume because we're marked to market on some of the assets.

JOHN SPINNEY: The marked to market is 25 million negative at the end of the quarter, which is really minor in our opinion and doesn't affect our regulatory capital.

JAMIE LESTER: I'm with you; I'm just trying to see -- you guys, obviously, had net income of what, 35 million? But equity was down 10 million in the quarter. So, I guess, what happened there?

JOHN SPINNEY: We had net income and then we had the marked to market on the portfolio, and the offset for the marked to market in the swaps runs through other OCI.

JAMIE LESTER: So there's another 20 million of swap?

JOHN SPINNEY: Roughly about 20 million; yes.

JAMIE LESTER: And then, where do you see, or how do you stand on the leverage side now? It looks like ending assets (indiscernible) interest-bearing assets of (indiscernible) I guess you look at total assets. I guess just walk us through where you are on the leverage side; it seems like you're kind of getting -- creeping towards the top-end.

JOHN SPINNEY: We're at like the 5 58 (ph), I think, at the end of the quarter. And I think we will trend a little bit higher towards the end of the year; so that's still under 6 percent.

JAMIE LESTER: It looks like, if you look at a spread, non-interest income to non-interest expense, it seems to be kind of trending up. Should we look at that growth rate -- whatever it is, 5 million a quarter, plus or minus -- as continuing through the year? How do you think about that, or is that even a useful metric to look at?

JOHN SPINNEY: I don't necessarily use that metric per se, but I think you could probably intuitively say that would go up.

JAMIE LESTER: What was the -- you mentioned the adjusted spread. If you take out the prepay penalties on the liability side for the quarter, what were the --?

JOHN SPINNEY: The margin would have been 203 and the spread would have been 196.

JAMIE LESTER: What would the spread have been for the first quarter on that same basis?

JOHN SPINNEY: I don't have that handy; it's probably about 10 basis points higher (multiple speakers) 13 and 206, probably.

JAMIE LESTER: **So you did see some compression in the quarter?**

JOHN SPINNEY: **Slightly.**
(Emphasis Added.)

22.    On October 21, 2004, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Expects to Report Fully Diluted EPS of $0.51 to $0.53 for q3 2004;

Evaluating FAS 91 Change But Expects No Significant Impact for 2004, 2003 or 2002 Reported

Results. The Company Reaffirms Expected Fully Diluted EPS of $2.00 to $2.05 for 2004." Therein,

the Company, in relevant part, stated:

> **Investors Financial Services Corp. (Nasdaq: IFIN) announced today that it expects to report fully diluted earnings per share of $0.51 to $0.53 for the quarter ended September 30, 2004. The Company also expects to report fully diluted earnings per share of $1.55 to $1.57 for the nine months ended September 30, 2004. The Company is releasing a preliminary earnings estimate today as it finalizes the impact of an expected change in application of Financial Accounting Standard No. 91 ("FAS 91"). This change is not expected to have a material impact on earnings for 2004.**
>
> \*\*\*
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, stated, "Our business trends remain strong, as both core services and ancillary services continued to show impressive growth in the third quarter. We are pleased with the continued validation of our unwavering commitment to superior client service. We continue to expect to achieve fully diluted earnings per share of $2.00 to $2.05 for 2004."
>
> **Commenting on the change in the application of FAS 91, the Company noted that it has historically applied a prospective method under FAS 91 to determine the amortization of premiums and accretion of discounts on applicable investment securities. The Company has determined that it is appropriate to change to applying a retrospective method on applicable investment securities. The Company does not believe that the impact of this change will be significant in the years 2004, 2003 and 2002. The impact on 2001 reported earnings per share could be higher due to changes in interest rates that occurred in that year. The Company is working closely with its audit committee in evaluating the effects of this change in application of FAS 91, and expects to complete this evaluation by November 15, 2004.**

(Emphasis Added.)

23.     That same day, October 21, 2004, Investors Financial's management held an investor

conference call to discuss its financial announcement. During the call defendants had the following

discussions with several industry analysts:

> JON ARFSTROM, ANALYST, RBC CAPITAL MARKETS: **Interesting release. Question on the accounting change, of course. Is it something that the auditors decided needed to be changed? When did it arise and can you just talk about what needs to be done before you can officially put out the number with the full release?**
>
> KEVIN SHEEHAN: **Sure. I think clearly everybody is looking at income recognition in this particular area. And we really have re-evaluated our approach. It is an extremely complex and technical area and we wanted to really essentially take a real hard look at what we were doing and make sure that we were using the right methodology. We have gone through an analysis of our portfolio and looked at it under both methodologies. It is a very time consuming and detailed exercise. We have involved both the audit committee and the external auditors in reviewing the results. And I think it will take us probably until the November 15th time frame to complete that exercise and process all the changes to the financials if they are necessary.**
>
> JON ARFSTROM: **Is it as simple as -- is it conservatism? And if one results in a lower number that's what you will choose or how do you differentiate between which method is the best to use?**
>
> KEVIN SHEEHAN: I think they are just really 2 fundamentally different methodologies and I think we have come to the conclusion in conjunction with our advisors that the retrospective method is the more correct method and more consistent with the requirements of GAAP. And we just have to change to it.
>
> JON ARFSTROM: **Okay. Another question, and I'm assuming that it is a net interest income impact which is why the number isn't disclosed in the release?**
>
> KEVIN SHEEHAN: Yes.

\*\*\*

KYLE SIMONAIRRO, ANALYST, T ROWE PRICE: **Do you have an estimate of a range of your net interest margin during the quarter?**

JOHN SPINNEY JR.: No.
(Emphasis Added.)

24.    On this news, shares of Investors Financial fell $7.20 per share, or 16.48 percent, on October 22, 2004, to close at $36.50 per share.

25.    On November 15, 2004, Investors Financial issued a press release entitled "Investors Financial Services Corp. Announces Third Quarter Earnings up 29%; Wins $160 Billion Middle Office Outsourcing Mandate With New European Client; Completes Previously Disclosed Review of FAS 91 and Related Restatement; Files Amended Forms 10K and 10Q." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported third quarter diluted earnings per share of $0.53, an increase of 29% from $0.41 in diluted earnings per share in the third quarter of 2003. Net income for the third quarter was $36.1 million, up 31% from $27.5 million in net income in the third quarter of 2003. For the nine months ended September 30, 2004, the Company reported diluted earnings per share of $1.57, an increase of 71% from $0.92 in diluted earnings per share for the same period in 2003. Net income for the nine months ended September 30, 2004 was $106.7 million, an increase of 74% from $61.2 million in net income for the same period of 2003.

\*\*\*

> The Company also reported today that it filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. Today the Company also filed an amended Annual Report on Form 10-K/A for the year ended December 31, 2003, and amended Quarterly Reports on Form 10-Q/A for the quarters ended March 31 and June 30, 2004. These filings complete the Company's restatement of its

financial statements for the years ended December 31, 2001, 2002, 2003 and for the six months ended June 30, 2004. As previously disclosed, the Company's restatement arose from its application of Statement of Financial Accounting Standards No. 91 to the Company's securities portfolio.

**The Company's cumulative restatement since inception resulting from the accounting review was a reduction of $6.2 million in net interest income. The opening adjustment to retained earnings on January 1, 2001 was an increase of $0.9 million. For the year ended December 31, 2001, the total net interest income adjustment was a reduction of $8.5 million, resulting in a decrease in diluted earnings per share of $0.08. The respective net interest income adjustments for the years ended December 31, 2002, 2003 and 2004 were a reduction of $2.3 million, an increase of $1.0 million and an increase of $2.7 million. The adjustments to diluted earnings per share in 2002, 2003 and 2004 were a reduction of $0.02 per share, an increase of $0.01 per share and an increase of $0.02 per share, respectively.**

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We have successfully completed a comprehensive review of the accounting for premiums and discounts on each investment in our securities portfolio. Consistent with our preliminary disclosure, our accounting review resulted in no significant change to our 2004, 2003 or 2002 results. Our operating results continue to display the leverage and resilience of our business model. We remain confident in our ability to grow our diluted earnings per share in excess of 30% in 2004."

"Our new business wins include the recent execution of an agreement to provide middle office outsourcing services for approximately $60 billion in assets managed by a new European client," Mr. Sheehan continued. "We have also signed a letter of intent to provide middle office outsourcing services for another $100 billion in assets managed by the same client."
(Emphasis Added.)

26.     That same day, November 15, 2004, Investors Financial's management held an

investor conference call to discuss its third quarter earnings. During the call defendants made the

following statements:

KEVIN SHEEHAN, CHAIRMAN, CEO, INVESTORS FINANCIAL SERVICES CORP.: I will begin by reviewing some of the key points from our restatement process which we successfully completed and then turn to our third-quarter results. John Spinney will finish with the detailed discussion of our financial results.

**Senior management, the audit community of the board, our internal auditors and our independent registered public accountants have completed a comprehensive review of the amortization of premiums and accretion of discounts on all of our investment securities. We have examined the accounting for and evaluation of each and every investment security in our portfolio from December 31, 2000 to September 30, 2004. We are now amortizing premiums and accreting discounts in the affected securities in accordance with generally accepted accounting principals, including FAS 91. Again, we're making this statement in relation to all the securities and security types in our portfolio.**

Today, we filed an amended annual report on form 10-KA for the year ended December 31, 2003. Amended quarterly reports on form 10-K -- 10-QA for the first two quarters of 2004 and our quarterly report on form 10-Q for the quarter ended September 30, 2004. We initially reported on October 21 that the impact of this change was not significant for the years 2002 through 2004, **but it resulted in a larger reduction in 2001 reported earnings per share due to the rapidly changing interest rate environment during that period. The company's cumulative restatement since inception, resulting from the accounting review was a reduction of 6.2 million in net interest income. The opening adjustment to retained earnings as of January 1, 2001, was an increase of .9 million.**

**2001's total net interest income adjustment was a reduction of 8.5 million, resulting in a decrease in diluted earning per share of 8 cents. The net interest income adjustment for 2002 was a reduction of 2.3 million or 2 cents per share. For 2003, the adjustment was an increase of $1 million or 1 cent per share. For 2004, the adjustment was an increase of 2.7 million or 2 cents per share. There was no significant change to our capital or leverage ratios for any restated quarter.** A detailed presentation of the changes arising from the restatement can be found in the reports we filed today with the SEC. In addition, this restatement did not impact the accounting for our SBA portfolio.

We did, however, correct a clerical error in the contractual maturity table in the MD&A session of our 2003 10-K. We previously reported federal agency securities having a yield of 3.16% in the over-10-year category and 2.76% in the 5- to 10-year category. These yields should have been 2.71% and 2.28% respectively, consistent with the income we recognize in our financial statements.

To summarize, we undertook a comprehensive effort to audit, recalculate and correct our financial statements and our SEC filings. We accomplished these tasks in a short period of time thanks to the tireless effort of our dedicated employees.

We will now turn to a review of our financial results. For the quarter ended September 30, 2004, we reported fully diluted earnings per share of 53 cents, up 29% from the third quarter of 2003's diluted EPS of 41 cents. For the 9 months ended September 30, 2004, net operating revenue rose 27% to 456 million while diluted operating earnings per share rose 52% and net operating income rose 56%. Our five-year compound annual growth rate and diluted earnings per share through September 30 remains an impressive 43%.

\*\*\*

JON ARFSTROM, ANALYST, RBC CAPITAL MARKETS: **Okay. And then I guess the last question is just on your interest rate positioning. Has anything that the Fed has done so far and the changes in the slope of the curve surprised you or has it all been consistent with your expectations for a flattening curve?**

JOHN SPINNEY: **It's pretty consistent with what we expected in terms of what the Fed moves have been. And it was built into that 300-basis point guidance we gave way back in June and continues to be in our guidance with the 200 basis points up from here today.**
(Emphasis Added.)

27.    On December 16, 2004, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Raises Earnings Guidance for 2004 Fully Diluted EPS; Expects Earnings

of $2.07 to $2.09 Per Share." Therein, the Company, in relevant part, stated:

Investors Financial Services Corp. (Nasdaq: IFIN) announced today

> that it has raised its earnings guidance for fully diluted earnings per share and currently expects $2.07 to $2.09 per share for the year ended December 31, 2004. The Company plans to report its final results for the quarter and year ended December 31, 2004 on or about January 25, 2004.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We have witnessed stronger business trends during the fourth quarter of 2004 due to higher asset values and transaction volumes that are driving solid results in our core and ancillary services. In addition, we recently completed the first conversion of our previously announced European outsourcing mandate. **Based upon our favorable operating environment and outlook for future sales, we remain comfortable with our long term guidance of 25% growth in fully diluted earnings per share."**
> (Emphasis Added.)

28. On January 25, 2005, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Announces 2004 Diluted Earnings Per Share Up 50%: 2004 Net Operating

Revenue Increases 25%." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported diluted earnings per share of $2.09 for the year ended December 31, 2004, an increase of 50% from $1.39 in 2003. Net income for the year ended December 31, 2004 was $142.0 million, up 54% from $92.4 million in 2003.
>
> ***
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services delivered another year of outstanding results during 2004. Sizeable wins from new and existing clients and the leverage inherent in our business model continue to drive our impressive performance. We remain confident in our ability to produce growth of 25% in diluted earnings per share in 2005."

29. That same day, January 25, 2005, Investors Financial's management held an investor

conference call to discuss its third quarter earnings. During the call defendants made the following

statements:

00005920.WPD ; 1                                    -21-

JOHN SPINNEY, CFO, SVP, INVESTORS FINANCIAL SERVICES CORP.: Thank you, and good afternoon. As Kevin mentioned, for the year ended December 31st, 2004, net operating revenue rose 25 percent to 613 million, while our expenses grew only 16 percent. As a result of this leverage in our model, we are able to grow net operating income by 43 percent to 142 million in diluted earnings per share by 39 percent to $2.09. For the fourth quarter, net operating revenue increased 19 percent year-over-year, while our diluted operating earnings per share grew to $0.52, an 11 percent increase over our fourth-quarter 2003 diluted EPS of $.47.

***

Turning to our earnings guidance for 2005, as we have done historically, we are reverting back to our targeted long-term diluted earnings-per-share growth rate of 25 percent at the outset of the year and will adjust our guidance as we progress through the year. Our guidance includes an additional 175 basis point increase in the fed (ph) funds rate from today to 4 percent by the end of 2005. We are also modeling a further flattening of the yield curve in 2005. We remain comfortable with our long-term growth rate of 25 percent EPS.

***

JOEL GOMBERG, ANALYST, WILLIAM BLAIR: (Indiscernible) It's not a list of -- and then, you had a pick-up in your deposits at year end. Is that something that is seasonal, and we expect to go back down? **And then, we have clearly seen some flattening of the yield curve here this last quarter. So maybe you could talk a little bit about your expectations on the margin -- some contraction here in the first quarter, as we move along if the deposits run down.**

KEVIN SHEEHAN: I think I would probably look at it more on an average basis and year-over-year on the deposits front. Regardless of what we've got right at 12/31 is grown tremendously. And that afforded us the ability to grow the balance sheet by $2 billion this year. And as our assets continued to grow that we administer, more deposit flow will come off of that as a result. So I feel pretty comfortable that deposit flows will continue to move in line with asset growth. And whatever we've got at year-end, it could have been a year-end principal and interest payments that we got over year-end. So I'd more focus on the average balance increasing.

> **And then with respect to the yield curve, we do have a flattening
> of the yield curve baked into our guidance for next year and
> expect dead (ph) funds to achieve 4 percent by the end of
> December. That's baked into our guidance. Does that answer
> your question?**
>
> JOEL GOMBERG: Yes, thank you.
> (Emphasis Added.)

30.    On April 13, 2005, Investors Financial issued a press release "Investors Financial

Services Corp. Announces First Quarter Earnings Up 11%." Therein, the Company, in relevant part,

stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported first
> quarter diluted earnings per share of $0.60, an increase of 11% from
> diluted earnings per share of $0.54 in the first quarter of 2004. Net
> income for the first quarter of 2005 was $40.9 million, up 12% from
> $36.6 million in net income in the first quarter of 2004.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer,
> commented, **"Investors Financial Services again delivered solid
> results in the first quarter of 2005. Our core services revenue
> grew impressively on both a year-over-year and linked quarter
> basis, driven by new business wins and client fund flows. We
> continue to have a number of exciting opportunities in our
> pipeline to drive earnings growth in fiscal year 2005."**
>
> Net operating revenue for the first quarter grew 8% to $167.8 million
> from $155.2 million for the same period in 2004. Revenue from core
> services such as global custody, multicurrency accounting and mutual
> fund administration grew to $88.5 million for the first quarter, up
> 16% from $76.1 million for the same period in the prior year.
> Revenue from ancillary services including securities lending, foreign
> exchange and cash management sweep services decreased to $26.7
> million for the quarter, down 11% from $30.1 million in the first
> quarter of 2004. Net interest income decreased 2% to $47.6 million
> for the first quarter of 2005 from $48.4 million for the same period in
> 2004. Operating expenses for the first quarter of 2005 grew 5% to
> $104.8 million from $100.1 million for the same period in 2004.
>
> Assets processed for clients totaled approximately $1.47 trillion at

March 31, 2005 compared to $1.43 trillion at December 31, 2004 and
$1.13 trillion at March 31, 2004.
(Emphasis Added.)

31.    That same day, April 13, 2005, Investors Financial's management held an investor

conference call to discuss its third quarter earnings.  During the call defendants made the following

statements:

JON ARFSTROM, ANALYST, RBC CAPITAL MARKETS: Okay.
And then the last question -- you have another 100 billion coming on
at some point in the middle of the year. And I thought I heard you say
towards the end of the year that you had built -- some of the expenses
that -- for boarding (ph) the first piece of business that has already
been set, can you talk about how we should think about that business
coming on? When we might see it, and how much expense pressure
there would be with boarding that business?

JOHN SPINNEY: **I think that will come in the second quarter in
terms of the revenue generation, probably towards the end of the
second quarter. And there will be some additional expense, but
I don't think anything that will change our outlook.**

\*\*\*

JOEL GOMBERG, ANALYST, WILLIAM BLAIR: John, can you
talk about your outlook for the rest of the year in terms of the net
interest market margin, as the Fed looks like will continue to raise
rates, and outlook for net interest income?

JOHN SPINNEY: **Yes, our outlook is still the same as it was
before, you know, a 4% Fed funds rate by the end of the year.
And I think what happened to us, and you saw it in this quarter's
results, was probably a little flatter curve than we anticipated. I
still think we will probably achieve net interest income about
what we achieved last year. We were talking a little bit higher
than that before.**

And depending on how the yield curve behaves the rest of the year,
it could be higher than that. So we are just keeping on the steady and
trying to manage through it right now.

-24-

JOEL GOMBERG: But net interest income, basically flat year-over-year?

JOHN SPINNEY: It could be flat, year-over-year, Joel. It could be higher than where it is today.

\*\*\*

DEAN ARNOLD, ANALYST, MILLENNIUM PARTNERS: Okay, and then lastly on your comments a few minutes ago about NII being potentially flat and maybe up year-over-year, depending on the yield curve and where rates are -- what does that imply for additional growth or shrinkage in short-term and other borrowings on the balance sheet?

JOHN SPINNEY: **You know, I think right now the balance sheet will continue to grow towards the end of the year. And we typically have it forecasted to grow somewhere around 20% as we had year-over-year on the balance sheet right now. And that will come with client liabilities. And to the extent there is a shortfall there, we may use some leverage, we may not, depending on what the investment alternatives are.**

DEAN ARNOLD: Okay. Is there a benchmark? When you look at your liabilities, short-term and other borrowings they are about 10%, maybe a little bit more, 12%. Is there a benchmark that you try to keep those to?

JOHN SPINNEY: No, I think as we have talked before, in many instances short-term borrowings are one of those things that can move from day-to-day depending on what type of client liabilities come in. And we have got clients that could come in on any particular day with 0.5 billion or 1 billion of liabilities. And if it happens on a quarter end, and we put up balance sheet out in the quarter end, the client funding will be a lot higher than it is in this quarter end versus any other quarter end. **And that is the beauty of running some short-term borrowings is because there is flexibility to buy assets when it is opportunistic for us, and it allows us to manage the liabilities.**

\*\*\*

STUART QUINT, ANALYST, GARTMORE GLOBAL

INVESTMENTS: Just a question on your previous comment about net interest -- about the yield curve being flatter than what you had initially anticipated. If you are saying net interest income is flat, and in your guidance -- I am just trying to get a sense for are you implying that there is something else that you are adjusting to offset the expectation that net interest income might be weaker than what you were initially thinking? Or am I reading too much into what you are saying?

JOHN SPINNEY: I think, back to Kevin's comments on his part of the presentation, we see the pipeline as being a lot more robust. And a lot of things are pent-up from the regulatory matters starting to flow through. And clearly closing sales and closing them sooner rather than later is going to make up for that. And with those new sales comes ancillary services, outback securities lending, cash management, that, again, drives some of the higher margin revenue lines items.

***

JON ARFSTROM: I think Stuart got my question. **But basically, what you're saying is -- flat to modestly higher NII will be offset by higher-than-expected fee income to get you to 25% growth rate. So the curve is steeper, NII is stronger; curve is flatter, NII is weaker, and the Cs (ph) more than likely will offset any margin pressure that we see. That is what you are saying, right?**

JOHN SPINNEY: Yes.
(Emphasis Added.)

32.     The statements referenced above in ¶¶ 15-23, 25-31 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others: (1) that the Company's improper accounting practices resulted in a $6.2 million reduction in net interest income; (2) that the Company lacked adequate internal controls; (3) that the Company's financial results were in violation of Generally Accepted Accounting Principles ("GAAP"); (4) that due to the impact of interest rate yield compression and the flattening of the interest rate curve the Company's 2005 guidance was not achievable; (5) that defendants' use of

interest rate swaps to hedge against the negative impact to the balance sheet was ineffective; and (6)

that as a consequence of the foregoing, defendants' statements with respect to the Company's growth

and progress lacked in all reasonable basis when made.

## The Truth Begins to Emerge

33.    On July 14, 2005, Investors Financial issued a press release entitled "Investors

Financial Services Corp. Announces Second Quarter Earnings Revises Fiscal Year 2005 and 2006

Guidance Announces Stock Repurchase Plan of up to $150 Million." Therein, the Company stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported second
> quarter diluted earnings per share of $0.64, an increase of 28% from
> diluted earnings per share of $0.50 in the second quarter of 2004. Net
> income for the second quarter of 2005 was $44.1 million, up 30%
> from $34.0 million in net income in the second quarter of 2004. For
> the six months ended June 30, 2005, the Company reported diluted
> earnings per share of $1.24, an increase of 19% from $1.04 in diluted
> earnings per share for the same period in 2004. Net income for the six
> months ended June 30, 2005 was $85.1 million, an increase of 21%
> from $70.5 million in net income for the same period of 2004.

\*\*\*

> Despite a more robust sales environment, including higher volumes
> of sales opportunities than in the previous two fiscal years and
> continued closing of strategically important new business wins in the
> first and second quarters of 2005, the Company is revising its fiscal
> year 2005 and 2006 diluted earnings per share guidance. The
> Company expects to achieve growth of approximately 10% in diluted
> earnings per share in 2005 compared to diluted earnings per share of
> $2.09 in 2004 under Accounting Principles Generally Accepted in the
> United States of America ("GAAP"). From a core diluted earnings
> per share perspective, the Company expects 2005 diluted earnings per
> share to be approximately flat with 2004 GAAP diluted earnings per
> share of $2.09. Core diluted earnings per share for 2005 excludes the
> impact of securities gains and the recognition of the indefinite
> reversal provision of APB 23 with respect to the Company's Irish
> subsidiaries. Management considers core diluted earnings per share
> a more useful depiction of the Company's results of operations, as

00005920.WPD ; 1                              -27-

this measure excludes these non-core items. For 2006, the Company expects GAAP diluted earnings per share to be approximately flat compared to expected 2005 GAAP diluted earnings per share. From a core earnings perspective, the Company expects to achieve approximately 8% to 10% growth in diluted earnings per share in 2006 over 2005 core diluted earnings per share.

A number of factors have contributed to the Company's revision of its historical target for annual growth in diluted earnings per share. Key factors that are driving the change in expected diluted earnings per share include: a flatter than expected yield curve; narrower than expected reinvestment spreads; weaker than expected market sensitive revenues, including fees linked to both the equity and foreign currency markets; and continued investments in headcount and technology to support new and existing clients. These factors are expected to be partially offset by continued strong growth in the Company's core service fees, which are driven by sales to new and existing clients and consistent growth in the Company's assets under administration. The Company's pipeline for new business remains medium and the Company continues to bid on and win mandates from new and existing customers.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Since our initial public offering in November 1995, the Company achieved a compound annual growth rate in diluted earnings per share of 39%. Over the last five years, a period characterized by generally weaker financial markets and more regulation of financial products, the Company grew diluted earnings per share at an impressive 42% compound annual growth rate. However, during 2005 we have experienced sustained interest rate pressure and market sensitive revenue challenges. As a result, with less than six months remaining in 2005, we do not believe that we will meet our historical annual growth target in diluted earnings per share in 2005 and 2006. We remain confident in and committed to our business model and our ability to deliver industry leading customer service levels and financial performance, including long-term growth in diluted earnings per share in excess of industry averages. We are announcing another important new business win today, a $30 billion full service contract with a major U.S. life insurance company."

34.    On this news, shares of Investors Financial fell $7.47 per share, or 17.99 percent, on

July 15, 2005, to close at $34.05 per share.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Investors Financial between October 15, 2003 and July 14, 2005, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

36.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

37.    Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

38.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

39.    A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually

00005920.WPD ; 1                                    -29-

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

40.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and

©     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## INVESTORS FINANCIAL'S VIOLATION OF GAAP RULES IN ITS QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC

41.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules.

42.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC

which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

43.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

©    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

    (f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶58-59); and

    (g)    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

44.    The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

## UNDISCLOSED ADVERSE INFORMATION

45.    The market for Investors Financial's publicly traded securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Investors Financial's publicly traded securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Investors Financial's publicly traded securities relying upon the integrity of the market price of Investors Financial's publicly traded securities and market information relating to Investors Financial, and have been damaged thereby.

46.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Investors Financial's publicly traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized
in this Complaint directly or proximately caused or were a substantial contributing cause of the
damages sustained by plaintiff and other members of the Class. As described herein, during the
Class Period, defendants made or caused to be made a series of materially false or misleading
statements about Investors Financial's business, prospects and operations. These material
misstatements and omissions had the cause and effect of creating in the market an unrealistically
positive assessment of Investors Financial and its business, prospects and operations, thus causing
the Company's publicly traded securities to be overvalued and artificially inflated at all relevant
times. Defendants' materially false and misleading statements during the Class Period resulted in
plaintiff and other members of the Class purchasing the Company's publicly traded securities at
artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

48.     As alleged herein, defendants acted with scienter in that defendants knew that the
public documents and statements issued or disseminated in the name of the Company were
materially false and misleading; knew that such statements or documents would be issued or
disseminated to the investing public; and knowingly and substantially participated or acquiesced in
the issuance or dissemination of such statements or documents as primary violations of the federal
securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of
information reflecting the true facts regarding Investors Financial, their control over, and/or receipt
and/or modification of Investors Financial's allegedly materially misleading misstatements and/or
their associations with the Company which made them privy to confidential proprietary information
concerning Investors Financial, participated in the fraudulent scheme alleged herein.

49.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

50.     During the Class Period and with the Company's stock trading at artificially inflated prices, company insiders sold 952,664 shares for gross proceeds of 44,755,857.24 as evidenced by the following chart:

|                   | DATE       | # OF SHARES           | PROCEEDS               |
| ----------------- | ---------- | --------------------- | ---------------------- |
| Robert D. Mancuso | 10/17/2003 | 30,000 @ $35.490      | $1,064,700             |
|                   | 01/26/2004 | 15,000 @ $43.150      | $647,250               |
|                   | 01/26/2004 | 17,665 @ $43.590      | $770,017               |
|                   | 01/27/2004 | 4,515 @ $42.640       | $192,519.6             |
|                   | 01/27/2004 | 13,000 @ $42.700      | $557,000               |
|                   | 04/15/2004 | 49,910 @ $40.410      | $2,016,863             |
|                   | 04/15/2004 | 50,267 @ $40.410      | $2,031,289             |
|                   | 04/15/2004 | 15,000 @ $40.000      | $600,000               |
|                   | 04/15/2004 | 88,168 @ $40.410      | $3,562,868             |
|                   | 07/19/2004 | 30,000 @ $44.240      | $1,327,200             |
|                   | 11/18/2004 | 15,406 @ $43.840      | $675,399.04            |
|                   | 11/18/2004 | 14,594 @ $43.970      | $641,698.18            |
|                   | 01/28/2005 | 30,000 @ $50.190      | $1,505,700             |
|                   | 04/18/2005 | 30,000 @ $43.690      | $1,310,700             |
|                   |            | **Total Shares: 403,525** | **Total Proceeds: $16,903,203.82** |
| Edmund J. Maroney | 10/17/2003 | 60,000 @ $35.285      | $2,117,100             |
|                   | 10/17/2003 | 60,000 @ $36.45       | $2,187,000             |
|                   | 11/06/2003 | 11,215 @ $35.20       | $394,768               |
|                   | 03/05/2004 | 15,000 @ $45.000      | $675,000               |
|                   | 03/05/2004 | 15,000 @ $44.93       | $673,950               |
|                   | 07/20/2004 | 15,000 @ $45.000      | $675,000               |
|                   | 12/27/2004 | 15,000 @ $50.000      | $750,000               |
|                   |            | **Total Shares: 191,215** | **Total Proceeds: $7,472,818** |

| Kevin J. Sheehan | 12/30/2003<br>01/05/2004<br>01/06/2004<br>04/13/2004<br>10/26/2004<br>10/26/2004<br>03/14/2005 | 9,000 @ $39.00<br>79,000 @ $39.03<br>15,000 @ $39.000<br>4,690 @ $42.610<br>19,291 @ $35.60<br>21,273 @ $35.60<br>155,000 2 $50.963<br>*Total Shares:*<br>*303,884* | $351,000<br>$3,083,370<br>$585,000<br>$937,253<br>$686,759<br>$757,318.8<br>$7,899,265<br>*Total Proceeds:*<br>*$18,319,335.8* |
| --- | --- | --- | --- |
| John Jr. Spinney | 12/18/2003<br>07/07/2004 | 2,954 @ $36.510<br>1,915 @ $42.660<br>*Total Shares:*<br>*4,869* | 107,850.54<br>81,693.9<br>*Total Proceeds:*<br>*$189,544.44* |
| Michael F. Rogers | 10/13/2003 | 49,171 @ $38.050<br>*Total Shares:*<br>*49,171* | $1,870,956<br>*Total Proceeds:*<br>*$1,870,956* |

## LOSS CAUSATION

51.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

52.     During the Class Period, Plaintiff and the Class purchased securities of Investors Financial at artificially inflated prices and were damaged thereby. The price of Investors Financial's common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

53.     At all relevant times, the market for Investors Financial's publicly traded securities was an efficient market for the following reasons, among others:

(a) Investors Financial's stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Investors Financial filed periodic public reports with the SEC and the NASDAQ;

© Investors Financial regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Investors Financial was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54. As a result of the foregoing, the market for Investors Financial's publicly traded securities promptly digested current information regarding Investors Financial from all publicly available sources and reflected such information in Investors Financial's stock price. Under these circumstances, all purchasers of Investors Financial's publicly traded securities during the Class Period suffered similar injury through their purchase of Investors Financial's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

55. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Investors Financial who knew that those statements were false when made.

## FIRST CLAIM
## Violation Of Section 10(b) Of
## The Exchange Act And Rule 10b-5
## Promulgated Thereunder Against All Defendants

56.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

57.     During the Class Period, defendant Investors Financial and the Individual Defendants, each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: a) deceive the investing public, including plaintiff and other Class members, as alleged herein; b) artificially inflate and maintain the market price of Investors Financial's publicly traded securities; and c) cause plaintiff and other members of the Class to purchase Investors Financial's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant Investors Financial and the Individual Defendants, each of them, took the actions set forth herein.

58.     These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Investors Financial's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Investors Financial, as alleged below.

59.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

60.    Investors Financial and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Investors Financial as specified herein.

61.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Investors Financial's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Investors Financial and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Investors Financial's securities during the Class Period.

62.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.    These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

00005920.WPD ; 1                          -39-

material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Investors Financial's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Investors Financial's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Investors Financial's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Investors Financial securities during the Class Period at artificially high prices and were damaged thereby.

65.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Investors Financial, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Investors

Financial publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.    By virtue of the foregoing, Investors Financial and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of The Exchange Act Against
### the Individual Defendants

68.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

69.    Each of the Individual Defendants acted as a controlling person of Investors Financial within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

00005920.WPD ; 1                    -41-

statements or cause the statements to be corrected.

70.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.    As set forth above, Investors Financial and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: Aug 15, 2005

**GILMAN AND PASTOR, LLP**
By: *David Pastor*

David Pastor (BBO #391000)
60 State Street, 37th Floor
Boston, MA 02109
Tel: 617.742.9700

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Tamara Skvirsky, Esquire
280 King of Prussia Road
Radnor, PA 19087
Tel: 610.667.7706

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Robert Faussner, (Plaintiff) declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction in the Investors Financial Services Corporation (NASDAQ: IFIN) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 200 | Bought | 2/9/04 | $42.15 |
| | | | |
| | | | |

5.    During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:   N/A

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  8th  day of  AUGUST , 2005.

_Robert Faussner_

**ROBERT FAUSSNER**

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS
Robert Faussner

**DEFENDANTS**
Investors Financial Services Corp., Kevin J. Sheehan, Michael F. Rogers, John N. Spinney Jr., Robert D. Mancuso, Edmund J. Maroney

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   San Mateo County California
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
David Pastor, Gilman and Pastor LLP
60 State St., 37th Floor, Boston MA 02109
617-742-9700

ATTORNEYS (IF KNOWN)

## 05 - 11687 RCL

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury — Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS — Third Party 26 USC 7609 | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
Action for securities fraud under 15 U.S.C., §78 (b) and for SEC Rule 10b-5.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY   JUDGE   Reginald Lindsay   DOCKET NUMBER   05-CV-11627

DATE   8-15-05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Robert Faussner v. Investors Financial Corp., et al.

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).**

   ☐   I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☒   II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

   ☐   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   ☐   IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 650, 660,      05-11687 RCL
             690, 810, 861-865, 870, 871, 875, 900.

   ☐   V.    150, 152, 153.

3. **Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**
   The Archdiocese of Milwaukee Supporting Funds v. Investors Financial Services Corp., et al., 05-CV-11627-RCL

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**
                                                                      YES ☐    NO ☒

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)**
                                                                      YES ☐    NO ☒
   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**
                                                                      YES ☐    NO ☐

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**
                                                                      YES ☐    NO ☒

7. **Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**
                                                                      YES ☒    NO ☐

   A.   **If yes, in which division do all of the non-governmental parties reside?**
        Eastern Division ☒       Central Division ☐       Western Division ☐

   B.   **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**
        Eastern Division ☐       Central Division ☐       Western Division ☐

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)**
                                                                      YES ☐    NO ☐

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S NAME**  David Pastor  Gilman and Pastor, LLP

**ADDRESS**  60 State Street, 37th Floor Boston, MA 02109

**TELEPHONE NO.**  617-742-9700

(Coversheetlocal.wpd - 10/17/02)